**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**GEORGE FLUELLEN, 90-A-3810**

                **Plaintiff,**                                      **06-CV-602E(Sr)**

v.

**COMMISSIONER GLENN S. GOORD,**
**et al.,**

                **Defendants.**
_____

## REPORT, RECOMMENDATION AND ORDER

This matter was referred to the undersigned by the Hon. John T. Elfvin, for all pretrial matters and to hear and report upon applications for injunctive relief. Dkt. #12.

Plaintiff, a practicing Muslim affiliated with the Nation of Islam, challenges DOCS' policy of refusing to permit individuals who have designated their religion as anything other than Rastafarian to wear dreadlocks. Dkt. #8. Plaintiff seeks injunctive relief, declaratory judgment, and compensatory and punitive damages for violations of his right to free exercise of religious beliefs, as protected by the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), during his incarceration at the Attica Correctional Facility ("Attica"). Dkt. #1. Plaintiff also claims that he was denied his constitutional right to due process during his disciplinary hearings and denied equal protection by virtue of defendants' haphazard application of the prohibition against dreadlocks. Dkt. #1.

Currently before the Court is plaintiff's motion for a preliminary injunction preventing the defendants from disciplining him for refusing to cut his dreadlocks or change his religious affiliation. Dkt. #7. For the following reasons, it is recommended that the Court enter a preliminary injunction preventing defendants from punishing plaintiff for refusing to cut his hair or refusing to change his religious affiliation, and preventing defendants from precluding plaintiff's attendance at Nation of Islam services and classes because of his dreadlocks. It is also recommended that this matter be consolidated, *sua sponte*, with 06-CV-490.[1]

## BACKGROUND

During the last week of February, 2006, C.O. Klodzinski and Sergeant O'Connell stopped plaintiff as he was entering Nation of Islam services because he was wearing his hair in matted locks (dreadlocks). Dkt. #1, ¶¶ 1-2. Plaintiff protested that he had been wearing his hair this way for 12 years in numerous correctional facilities throughout the state, including four years at Attica, but C.O. Klodzinski informed plaintiff that only inmates of the Rastafarian faith are allowed to wear dreadlocks. Dkt. #1, ¶ 3. Sergeant O'Connell informed plaintiff that he would consult with his supervisors about the matter and allowed plaintiff to attend services. Dkt. #1, ¶ 5.

---

[1] Plaintiff's name was included as a plaintiff in the caption of an action filed with the Court on March 22, 2006, but the action was terminated with respect to him on November 11, 2006 for failure to submit a signed complaint or amended complaint and for failure to submit a request to proceed *In Forma Pauperis*. *See Amaker v. Goord*, No. 06-CV-490, at Dkt. #39. That action is based upon the same facts and legal theories as the instant action and, by Report and Recommendation entered March 9, 2007, the Court recommended entry of a preliminary injunction with similar terms to those requested in the instant case. Dkt. #88.

On May 29, 2006, plaintiff was prevented from attending Nation of Islam services by C.O. Jaboega, who instructed him to either change his religion to Rastafarian or cut his hair.  Dkt. #1, ¶ 9.  Plaintiff informed C.O. Jaboega that he would violate his religious beliefs by cutting his hair.  Dkt. #1, ¶ 11.  Plaintiff was escorted to his cell where he remained until he was called to the barber shop.  Dkt. #1, ¶ ¶ 12-14.  C.O. Jaboega gave plaintiff a direct order to go into the barber shop and have his hair cut.  Dkt. #1, ¶ 15.  When plaintiff refused the order because it violated his religious beliefs, C.O. Jaboega placed plaintiff in keeplock and issued a misbehavior report.  Dkt. #1, ¶ ¶ 16-18.  Commissioner's Hearing Officer ("CHO"), Dixon found plaintiff guilty of violating a direct order and imposed a sentence of 29 days keeplock and 30 days loss of telephone, commissary and packages.  Dkt. #1, ¶ 38.  Plaintiff was released from keeplock on June 28, 2006.  Dkt. #1, ¶ 47.

On June 29, 2006, Sergeant O'Connell ordered plaintiff to either change his religion or cut his hair.  Dkt. #1, ¶ 48.  When plaintiff refused, he was placed in keeplock, issued a misbehavior report for refusing to comply with a direct order, found guilty of the charge by CHO Murray and sentenced to 30 days keeplock and 30 days loss of commissary, telephones and packages.  Dkt. #1, ¶¶ 49-53.

One day after his release from keeplock, on July 30, 2006, C.O. Chapman ordered plaintiff to either change his religion to Rastafarian or cut his hair, ultimately resulting in 90 days keeplock and loss of commissary, telephones and packages.  Dkt. #1, ¶¶ 55-64.

Plaintiff affirms that his refusal to cut his dreadlocks is based upon a provision of the Quran, specifically, Chapter 2, verse 196, which states, in part:

> when you make up your mind to perform Hajj and Umrah, accomplish these to please Allah.  But if you are hemmed in somewhere, then offer to Allah whatever sacrifice you can afford.  And do not shave your heads until the sacrifice reaches its place.

Dkt. #9, p.24.  Plaintiff affirms that he took the vow to begin the pilgrimmage in 1994.  Dkt. #8, ¶ 7.  Plaintiff also cites a portion of the Sunan Abu Dawud discussing the matting and growth of hair.  Dkt. #9, p.25.

DOCS' Inmate Grooming Standards provide that initial shaves and haircuts shall be required of all newly committed male inmates unless exempted.  Dkt. #14, p. 32.  Inmates who profess to be a Rastafarian, Taoist, Sikh, Native American, Orthodox Jew, or member of any other religious sect of a similar nature cannot be forced to comply with the initial haircut requirements.  Dkt. #14, p.34.  Thereafter, all inmates are permitted to grow their hair to any length desired by the inmate, but must tie long hair, which is defined as hair below shoulder length, in a ponytail.  Dkt. #14, pp.33 & 35.  Native Americans are exempted from this restriction during the course of scheduled and approved Native American cultural ceremonies.  Dkt. #14, p.34.  The only braids allowed are the corn row style and any such braids must be woven close to the scalp in straight rows from the forehead to the back of the neck, without design or symbols, and may not extend below the hairline.  Dkt. #14, p.35.  In addition, DOCS asserts that, as set forth in Directive #4040, decisions of the Central Office Review

Committee ("CORC"),[2] including decisions providing that only inmates of the Rastafarian faith may have dreadlocks, are afforded the effect of directives. Dkt. #14, pp.37-40.

Mark Leonard, Director of Ministerial, Family and Volunteer Services for DOCS, is responsible for "ensuring that all religious programs are carried out in accordance with the policies and procedures adopted by DOCS and are supervised by a qualified religious leader." Dkt. #14, ¶ 1. Director Leonard declares that DOCS accommodates religious group activities for a number of religions represented within its facilities. Dkt. #14, ¶ ¶ 2-3. Upon entry into DOCS, inmates voluntarily state their religion and, if that religion is a recognized religious group, the inmate is permitted to attend that group's religious services. Dkt. #14, ¶ 10. "If an inmate is determined to be a bona fide member of the religious group, he/she is entitled to all of the religious privileges afforded to that religious group." Dkt. #14, ¶ 12. Although DOCS recognizes that an inmate may practice a group religion in a way that is not recognized by the tenets of the religious group and may claim to need special accommodations in addition to those of the religious group to which he belongs, "DOCS cannot realistically accommodate the religious practices of every inmate who claims his individualized requests for privileges are . . . based on the unique way he practices a group religion." Dkt. #14, ¶¶ 29-31.

---

[2] DOCS' grievance procedure permits an inmate to file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). An inmate may appeal an adverse decision to the prison superintendent. Thereafter, an inmate may appeal the superintendent's decision to CORC. *See Hemphill v. New York*, 380 F.3d 680, 682 (2d Cir. 2004); N.Y.C.R.R. § 701.7(c)(4).

Director Leonard declares that DOCS is unable to accommodate all inmates' individualized beliefs due to (a) the difficulty in determining whether the individualized beliefs are sincere; (b) the substantial administrative burdens; and (c) security concerns.  Dkt. #14, ¶ 41.  Director Leonard notes that "[w]henever an inmate receives special privileges, DOCS needs to monitor those privileges to ensure that the correct inmate receives them and does not abuse them."  Dkt. #14, ¶ 48.  Director Leonard asserts that "[m]aking inmates chose one religion helps ensure that the items and practices associated with that religion are necessary for religious purposes and not to promote illicit activities."  Dkt. #14, ¶ 58.  "Without this restriction," he declares that "any inmate could wear dreadlocks . . . simply by claiming that his religious beliefs required it" which "would make smuggling contraband easier and more prevalent in the correctional facilities."  Dkt. #14, ¶ 58.  Director Leonard declares that "the smuggling of contraband in DOCS facilities pose[s] significant security problems and put[s] prison staff and other inmates at risk for serious bodily injury."  Dkt. #14, ¶ 60.

Director Leonard confirms that "inmates are not allowed to wear dreadlocks unless it is recognized as part of a designated religious belief" and declares that "[o]nly the Rastafarian religion has a recognized dogma regarding dreadlocks, and therefore DOCS allows only inmates of the Rastafarian faith to wear dreadlocks.  Dkt. #14, ¶ ¶ 63, 65.  Director Leonard declares that

> The Rastafarian religious mandate and symbolism regarding dreadlocks also appears to be in stark contrast to Nation of Islam, where shaving is seen as a value of cleanliness . . . Nation of Islam . . . religious tenets simply do not require or dictate dreadlocks as a particular hairstyle, and are not an essential part of that faith.  As a designated member of

> [Nation of Islam], plaintiff's decision to wear dreadlocks is a personal choice and is not mandated by his religion. Simply put, [Nation of Islam] does not have a recognized body of religious dogma regarding dreadlocks, and DOCS does not allow [Nation of Islam] or other faith group members to wear dreadlocks.

Dkt. #14, ¶ 66. Director Leonard further declares that

> Plaintiff's claim that he has a right as a designated member of [Nation of Islam] to wear dreadlocks is clearly in conflict with DOCS' policy, rules and regulations . . . and if allowed would result in a[n] increased risk in breach of security for the correctional facility, conflict with Rastafarian principles and cause potential unrest among the Rastafarian inmate population, and jeopardize the safety of the staff and other inmates.

Dkt. #14, ¶ 68. Director Leonard also declares that plaintiff's claim of denial of participation in Nation of Islam services "would appear to be a self-created hardship" and notes that "[a]s soon as plaintiff complies with DOCS policies and completes his SHU disciplinary penalties, he will be able to attend [Nation of Islam] services and activities." Dkt. #14, ¶ 69.

## DISCUSSION AND ANALYSIS

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167-68 (W.D.N.Y. 1997), *citing Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994).

In most cases, a party seeking to obtain a preliminary injunction must establish that he will suffer irreparable harm in the absence of an injunction and demonstrate either: (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in the movant's favor. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). "Where a moving party challenges government action taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party cannot resort to the fair ground for litigation standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Id.* (internal quotations omitted). In addition, where an injunction is mandatory – that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act – the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from a denial of the injunction. *Phillip v. Fairfield University*, 118 F.3d 131, 133 (2d Cir. 1997). "This heightened standard is also required where the issuance of the injunction would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial." *Id.* The same standards apply to a party seeking a temporary restraining order. *Ifill v. Goord*, No. 03-CV-355, 2004 WL 1663994, at *1 (W.D.N.Y. April 8, 2004).

In the instant case, defendants assert that the heightened standard applies becuase plaintiff is seeking a mandatory injunction. Dkt. #15, p.5. The Court disagrees. Because plaintiff affirms that he has been wearing dreadlocks and attending

Nation of Islam services since 1994, an injunction preventing enforcement of the CORC decisions against plaintiffs pending resolution of this lawsuit would preserve the status quo. Dkt. #8, ¶ 7. In contrast, the Court's denial of a preliminary injunction would permit continued discipline against plaintiff and prevent his attendance at Nation of Islam services for the duration of this lawsuit. Such deprivations could not be undone should the plaintiff ultimately prevail. Accordingly, the Court will consider whether plaintiff will suffer irreparable harm in the absence of an injunction and whether he has established a likelihood of success on the merits.

Likelihood of Success

RLUIPA was enacted following the determination of the United States Supreme Court that the Religious Freedom Restoration Act ("RFRA"), exceeded Congress' remedial powers under the Fourteenth Amendment. *See Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005). RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison. 42 U.S.C. § 2000cc-1(b)(1); *see id.* at 715-16. The statute provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>    (1) is in furtherance of a compelling governmental interest;
>
> and
>
>    (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). This standard is "carried over from RFRA." *Cutter*, 544 U.S. at 717; *see Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005) ("test is the same as that previously imposed under RFRA"), *cert. denied*, __ U.S. __, 127 S. Ct. 187 (2006).

By enacting RLUIPA, Congress mandated "a more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006) (internal quotation omitted). "In addition to prescribing strict scrutiny, Congress mandated that RLUIPA be construed 'in favor of broad protection of religious exercise.'" *Id., quoting* 42 U.S.C. § 2000cc-3(g). "Congress, in other words, 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." *Id., quoting Murphy v. Missouri Dep't of Corr.*, 372 F. 3d 979, 987 (8th Cir.), *cert. denied*, 543 U.S. 991 (2004). Thus, this standard is more stringent than the four-factor, rational-relationship-to-legitimate-penological-interest standard set forth in *Turner v. Safley*[3] for analysis of free exercise claims pursuant to the First Amendment. *See Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Lawmakers anticipated, however, "that courts entertaining complaints under § 3 would accord 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter*, 544 U.S. at 723.

---

[3] 482 U.S. 78 (1987).

Defendants argue that plaintiff cannot demonstrate likely success because his interpretation of the Quran is incorrect. Dkt. #15, pp.5-9. Plaintiff responds that it is improper for the Court to assess the validity of his interpretation of his religious obligations. Dkt. #26, ¶¶ 29-33.

RLUIPA's definition of "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This expansive definition was recognized by the United States Supreme Court, which confirmed that the statute "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's professed religiosity." *Id.* at 725.[4] As the Court of Appeals for the Second Circuit explained in the context of a constitutional claim:

> Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith. For, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."

*McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir. 2004), *quoting Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989). In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a

---

[4] "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter*, 544 U.S. at 725 (internal citation omitted); *see Ford*, 352 F.3d at 593-94 (The relevant question is whether a particular activity is considered central or important to the inmate's practice of religion). However, defendants do not challenge the sincerity of plaintiff's belief in the religious texts cited and plaintiff's credibility regarding the sincerity of his belief in the importance of maintaining his dreadlocks is bolstered by his determination to suffer keeplock and denial of participation in Nation of Islam services rather than cut his hair.

prisoner's free exercise claim." *Id.* at 203, *citing Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003). Thus, plaintiff need not demonstrate that his interpretation of the requirements of his religion are correct in order to demonstrate likelihood of success on the merits.

Defendants argue that "DOCS' application of its rules and regulations and policy . . . do not violate [RLUIPA] since DOCS has not imposed a substantial burden on plaintiff's religious exercise." Dkt. #15, p.14. Although the statute does not define "substantial burden," courts have incorporated the definition adopted in related contexts to conclude that a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *See Lovelace,* 472 F.3d at 187; *Jolly*, 76 F.3d at 477. In *Jolly*, the Court of Appeals for the Second Circuit determined that a choice of submitting to a test for latent tuberculosis or adhering to the belief that it is a sin to take artificial substances, such as those allegedly used in the test, into the body and enduring medical keeplock, constituted a substantial burden on plaintiff's religious exercise. *Id.* at 477. In a factually similar case to the instant matter, the Court of Appeals for the Ninth Circuit held that the California Department of Corrections' grooming policy imposed a substantial burden on a Native American's religious practice because it "intentionally puts significant pressure on inmates . . . to abandon their religious beliefs by cutting their hair" or withstand discipline, including keeplock and loss of recreation, telephone, commissary and other privileges. *Warsoldier*, 989 F.3d at 996. As in *Warsoldier*, this Court has little difficulty determining that forcing an individual who sincerely believes that he should wear dreadlocks as part

of his religious practice to either forgo his affiliation with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice.

DOCS relies upon its compelling government interest in maintaining prison security, safety and sanitation to justify its policy. Dkt. #55, p.5. The Court readily recognizes that prison safety and security are compelling governmental interests. *See Cutter,* 544 U.S. at 725, n.13 ("prison security is a compelling state interest"); *Pell v. Procunier,* 417 U.S. 817, 823 (1974) ("central to all other corrections goals is the institutional consideration of internal security"); *Jolly*, 76 F.3d at 477 (noting DOCS compelling state interest in protecting inmates from infectious diseases). The Court also recognizes that the Court of Appeals for the Sixth Circuit, relying upon prison administrators' averments that there were no other means of achieving prison safety and security, upheld Ohio's absolute ban on long hair. *Hoevenaar*, 422 F.3d 366.

In the instant case, however, DOCS has determined that permitting Rastafarians to wear dreadlocks does not impose an insurmountable threat to DOCS' security, safety or sanitation. Moreover, DOCS does not appear to have any concerns that permitting this particular plaintiff to wear dreadlocks would threaten DOCS' security, safety or sanitation. As stated by DOCS,

> plaintiff can chose to comply with DOCS grooming standards
> and religious programs and practices set forth in Directive
> 4914, Directive 4202, and relevant CORC decisions, and
> attend and participate in [Nation of Islam] services or
> activities, or change his religious designation to Rastafarian
> to maintain his dreadlocks and participate in Rastafarian
> services and activities. The choice is his, but he cannot
> have it both ways since dreadlocks are not recognized for

>being religiously mandated for [Nation of Islam] adherents, implicate prison security and administrative concerns, and plaintiff has ample means of practicing his religious beliefs.

Dkt. #15, p.13.  In addition, DOCS permits all inmates to grow their hair to any length so long as hair extending below shoulder length is tied back in a ponytail.

DOCS expresses concern with the administrative burden of accommodating individual religious beliefs which do not conform to the generally accepted practices of a recognized religious group. *See* Dkt. #55, p.5 ("There would be an enormous administrative burden if DOCS were required to accommodate the individualized religious beliefs of 63,000 inmates.").  While the Court is sympathetic to such difficulties, and does not suggest that DOCS' assessment of administrative burden should not be given deferential consideration, as set forth above, the statute is clear that DOCS cannot administer the religious exercise of its inmate population based upon its assessment of the validity of the requested practice to the religious denomination professed by the inmate.

Irreparable Harm

Defendants argue the plaintiff cannot demonstrate irreperable harm because DOCS is not demanding that plaintiff shave his head, but only that he cut his matted locks.  Dkt. #15, p.4.  Because defendants interpret the religious texts that plaintiff relies upon to demonstrate the sincerity of his beliefs as only prohibiting him from shaving his head, they argue that compliance with DOCS' Inmate Grooming Standards will not harm plaintiff.  Dkt. #15, p.4.  Plaintiff asserts that "it would violate his religious beliefs to cut his hair."  Dkt. #26, ¶ 17.

"To satisfy the irreparable harm requirement, Plaintiff[] must demonstrate that absent a preliminary injunction [he] will suffer an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotations omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 747 (1976). Moreover, "[c]ourts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA." *Jolly*, 76 F.3d at 482. Defendants' discipline of plaintiff for his refusal to cut his hair or change his religious affiliation substantially burdens plaintiff's sincere religious beliefs, thereby satisfying the irreparable injury requirement.

**Consolidation**

Rule 42(a) of the Federal Rules of Civil Procedure provides that "[w]hen actions involving a common question of law or fact are pending before the court . . . it may order all the actions consolidated." "The trial court has broad discretion to determine whether consolidation is appropriate." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990). Moreover, a "district court can consolidate related cases under Federal Rule of Civil Procedure 42(a) *sua sponte*." *Devlin v. Transportation Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999). "In assessing whether consolidation is appropriate in given circumstances, a district court should consider both equity and judicial economy." Id. The paramount concern, however, is whether

"savings of expense and gains of efficiency can be accomplished *without sacrifice of justice*." *Id.; see Johnson,* 899 F.2d at 1285 ("Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial." ).

In the instant case, the Court believes that consolidation of this action with 06-CV-490 would promote judicial economy as well as justice.  Each of the three plaintiffs complain that they were disciplined for refusing to either cut their hair or change their religious affiliation from Nation of Islam to Rastafarian.  Each of the three plaintiffs challenge DOCS' Inmate Grooming Standards.  Six of the nine defendants named in this action are also defendants in 06-CV-490.  The original complaint in 06-CV-490 named all three plaintiffs.  By consolidating these cases, all parties can benefit from uniform discovery, settlement negotiations and trial strategy.

## **CONCLUSION**

Based on the foregoing, it is recommended that plaintiff's motion for injunctive relief (Dkt.#7), be granted and that defendants be enjoined from precluding plaintiffs' attendance at Nation of Islam services and classes because of his dreadlocks and from punishing plaintiff for refusing to cut his hair or refusing to change his religious affiliation.   It is also recommended that this matter be consolidated with 06-CV-490.

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order</u>.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of</u>

<u>Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to the *pro se* plaintiff and counsel for the defendant.

The Clerk is also directed to send a copy of this Order and a copy of the Report and Recommendation to the *pro se* plaintiffs in 06-CV-490 to afford them notice of the Court's recommendation to consolidate.

       **SO ORDERED.**

DATED:    Buffalo, New York
             March 12, 2007

                                   **S/ H. Kenneth Schroeder, Jr.**
                                   **H. KENNETH SCHROEDER, JR.**
                                   **United States Magistrate Judge**